CARLO F. VAN DEN BOSCH, Cal. Bar No. 185207
cvandenbosch@sheppardmullin.com
MICHELLE LAVOIE WISNIEWSKI, Cal. Bar No. 234032
mwisniewski@sheppardmullin.com
ASHLEY E. MERLO, Cal. Bar No. 247997
amerlo@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
650 Town Center Drive, 4th Floor
Costa Mesa, California  92626-1993
Telephone:  714-513-5100
Facsimile:   714-513-5130

ROBERT D. ROSE, Cal. Bar No. 62559
rrose@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
501 W Broadway #1900
San Diego, CA 92101-3598
Telephone:  619-338-6500
Facsimile:   619-234-3815

Attorneys for Defendants
HANA BANK and
HANA FINANCIAL GROUP

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SPRING STREET DIVISION

| | |
|---|---|
| HANA FINANCIAL, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>HANA BANK, a Korean corporation, HANA FINANCIAL GROUP, a Korean corporation<br><br>Defendants. | Case No. CV07-1534PA(JWJx)(csb)<br>*The Hon. Percy Anderson*<br><br>**DEFENDANTS' TRIAL BRIEF**<br><br>Complaint Filed:      March 8, 2007<br>Pretrial Conference:  April 22, 2011<br>Trial Date:            May 17, 2011 |

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION ..................................................................................1

II.     FACTUAL BACKGROUND ...............................................................1

        A.     HANA BANK'S BUSINESS ......................................................1

        B.     HANA FINANCIAL GROUP .....................................................3

        C.     HFI'S BUSINESS ........................................................................3

        D.     The History Between HFI and Hana Bank .............................4

III.    HFI'S TRADEMARK INFRINGEMENT CLAIMS LACK MERIT .............5

        A.     Hana Bank Has Senior Rights In The HANA Mark..............................6

        B.     HFI Cannot Demonstrate A Likelihood Of Confusion...........................7

               1.     The Similarity Of The Marks ......................................7

               2.     Strength Of The HANA Mark ......................................8

               3.     The Parties' Services Differ ........................................9

               4.     The Parties' Marketing Channels Differ ......................................9

               5.     Scant Evidence Of Actual Confusion Exists ...............................9

               6.     Purchasers Exercise A High Degree Of Care In Using
                      Hana Bank's High End Financial Services ................................10

               7.     Hana Bank Used Its Name In Good Faith .................................10

               8.     Likelihood of Expansion..............................................11

        C.     There Is No Evidence That Hana Financial Group Has Used The
               HANA Mark In The United States ........................................11

IV.     DEFENDANTS' AFFIRMATIVE DEFENSES .............................................12

        A.     Laches ...................................................................................12

DEFENDANTS' TRIAL BRIEF

B.      Unclean Hands ...................................................................................14

V.      CONCLUSION .............................................................................................15

DEFENDANTS' TRIAL BRIEF

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

### <u>Cases</u>

4

*Accuride Int'l., Inc. v. Accuride Corp.*
5
  871 F.2d 1531 (9th Cir. 1989) ........................................................... 10

6

*Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*
  616 F.2d 440 (9th Cir. 1980) ............................................................. 8
7

8

*AMF Inc. v. Sleekcraft Boats*
  599 F.2d 341 (9th Cir. 1979) ...................................................7, 8, 10, 11
9

10

*Brookfield Communications v. West Coast Ent.*
  174 F.3d 1036 (9th Cir. 1999) ......................................................... 5, 6

11

12

*Casual Corner Associates, Inc. v. Casual Stores of Nevada, Inc.*
  493 F.2d 709 (9th Cir. 1974) ............................................................. 6

13

14

*Cohn v. Petsmart, Inc.*
  281 F.3d 837 (9th Cir. 2002) ............................................................. 9

15

16

*CreAgri, Inc. v. USANA Health Sciences, Inc.*
  474 F.3d 626 (9th Cir. 2007) ............................................................. 5

17

18

*CTC Int'l v. Hero Cycles Private,*
  26 U.S.P.Q. 2d (BNA) 1309, 1992,
  WL 486354 at *4 (C.D. Cal. July 20, 1992) ........................................ 6

19

20

*First Franklin Financial Corp. v. Franklin First Financial, Ltd.*
  356 F. Supp. 2d 1048 (N.D. Cal. 2005)................................1, 8, 10, 14

21

22

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*
  826 F.2d 837 (9th Cir. 1987) ........................................................... 14

23

24

*Glow Industries, Inc. v. Lopez*
  252 F. Supp. 2d 962 (C.D. Cal. 2002)................................................. 8

25

26

*Golden W. Fin. v. WMA Mortgage Servs.*
  2003 WL 1343019 (N.D. Cal. 2003)................................................. 10

27

*Grupo Gigante S.A. de C.V. v. Dallo & Co., Inc.*
  119 F. Supp. 2d 1083 (C.D. Cal. 2000)............................................. 12

28

-iii-

*Grupo Gigante S.A. de CV v. Dallo & Co., Inc.*
　　391 F.3d 1088, 73 U.S.P.Q.2d 1258 (9th Cir. 2004)..........................5, 12, 13, 14

*Hall v. Wright*
　　125 F.Supp. 269 (S.D. Cal. 1954) ....................................................... 14

*In re American Safety Razor Co.*
　　2 U.S.P.Q.2d 1459 (T.T.A.B. 1987)...................................................... 8

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*
　　304 F.3d 829 (9th Cir. 2002) ............................................................ 12

*Karl Storz Endoscopy Am., Inc. v. Surgical Tech., Inc.*
　　285 F.3d 848 (9th Cir. 2002) ............................................................ 13

*Miller v. Glenn Miller Prods.*
　　318 F. Supp. 2d 923 (C.D. Cal. 2004)................................................. 12

*Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*
　　856 F.2d 1445 (9th Cir. 1988) ............................................................ 8

*Murray v. Cable Nat'l Broad. Co.*
　　86 F.3d 858 (9th Cir. 1996) ................................................................ 9

*Nutri/System, Inc. v. Con-Stan Indus., Inc.*
　　809 F.2d 601 (9th Cir. 1987) ........................................................ 7, 10

*Sengoku Works v. RMC Int'l*
　　96 F.3d 1217 (9th Cir. 1996) .............................................................. 6

*Thane Int'l, Inc. v. Trek Bicycle*
　　305 F.3d 894 (9th Cir. 2002) ........................................................... 10

*Tillamook Country Smoker, Inc. v. Tillamook County Creamery Assoc.*
　　465 F.3d 1102 (9th Cir. 2006) ..................................................... 12, 13

*Transworld Airlines v. American Coupon Exchange*
　　913 F.2d 676 (9th Cir. 1990) ....................................................... 12, 13

*United States v. BestFoods*
　　524 U.S. 51 (1998) ......................................................................... 12

*Urecal Corp. v. Masters*
　　413 F.Supp. 873 (N.D. Ill. 1976)....................................................... 14

-iv-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Watec Co. v. Liu*
   403 F.3d 645 (9th Cir. 2005) ...................................................................6

**<u>Statutes</u>**

15 U.S.C. § 1114 .......................................................................................5

15 U.S.C. § 1125(a) ...................................................................................5

Cal. Civ. Proc. Code § 338 ......................................................................13

California Business & Professions Code § 17200 .....................................5

**<u>Other Authorities</u>**

THOMAS MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION,
   2d Ed. 1984 & Supp. Dec. 1991 ............................................................6

1   **I.     INTRODUCTION**

2        Hana Financial, Inc. ("HFI") has sued Hana Bank and Hana Financial Group

3   ("HFG") for alleged infringement of its trademark HANA FINANCIAL and

4   pyramid design arising from Hana Bank's use of the HANA mark in connection with

5   financial services.  HFI's claims lack merit.

6        *First*, Hana Bank's use of the HANA mark pre-dates HFI's first use, giving it

7   senior rights in the mark.  Hana Bank has used the HANA mark in the United States

8   since as early as July 1994 and has continuously provided services to Koreans

9   residing in the United States under that mark since that time.  HFI, on the other

10   hand, was not incorporated until August 1994, and first used the HANA mark in

11   commerce in April 1995.

12        *Second*, Hana Bank will demonstrate that HFI has known about Hana Bank's

13   use of the mark for years and unreasonably delayed in filing suit, and that HFI has

14   acted inequitably in adopting its HANA mark and pyramid logo and therefore is

15   barred from relief.

16        *Third*, even if HFI were found to have senior rights in the HANA mark, HFI

17   must still demonstrate a likelihood of consumer confusion, which will be very

18   difficult under the facts of this case.

19        Finally, as to HFG, there is no evidence that it ever used the HANA mark in

20   the United States or any basis to find it derivatively liable (to the extent that Hana

21   Bank even faces liability).

22   **II.    FACTUAL BACKGROUND**

23        **A.    HANA BANK'S BUSINESS**

24        Hana Bank is one of the largest financial institutions in the Republic of

25   Korea.  The bank was originally established in 1971 as a Korea Investment Finance

26   Corporation.  The bank changed its name to Hana Bank in 1991.

27

28

1   Hana Bank was voted Korea's best bank in 1993 by *Euromoney Magazine*.

2   In 1995, it was the first bank to receive a superior "AA" rating in all categories of

3   management evaluation of the Korean Banking Supervisory Authority.

4   In May of 1994, Hana Bank established a program called the Hana Overseas

5   Korean Club as a means to provide financial services to Korean expatriates living

6   abroad, including those living in the United States.  Hana Overseas Korean Club

7   services were available in the United States at least as early as July 12, 1994.

8   Through its Hana Overseas Korean Club, Hana Bank manages the financial assets of

9   its United States customers, and upon request converts funds to the U.S. dollar

10   currency and remits them via wire transfer to the domestic customer.

11   Hana Bank launched an advertising campaign for the Hana Overseas Korean

12   Club in July of 1994.  As part of this campaign, Hana Bank ran an advertisement in

13   the July 14, 1994 edition of The Korea Times, Los Angeles Edition.  This

14   advertisement displayed both the Hana Overseas Korean Club name and the Hana

15   Bank name and logo in Korean.

16   The below graphics represent the Hana Bank logo in Korean, and its English

17   language equivalent.

18
19        

20   Hana Bank's domestic advertising in 1994 generated an immediate response

21   from consumers.  One consumer in Granada Hills, California, wrote to Hana Bank

22   on July 18, 1994, inquiring about the company's services to United States residents.

23   On the same day, another customer in Los Angeles, California, sent a similar inquiry

24   letter to Hana Bank.  United States customers began joining the Hana Overseas

25   Korean Club in 1994.  Hana Bank approved membership applications for domestic

26   customers at least as early as November 24, 1994.  Thereafter, Hana Bank

27   continuously received and approved applications from United States customers in

28

1 each year through the present.  These applications bear the Hana Bank logo in the

2 bottom right hand corner.

3      Between 1994 and the present, Hana Bank has continuously provided

4 financial services, including foreign exchange, wire transfer, and asset management

5 services, to United States customers located in at least the following states:

6 California, Hawaii, Illinois, Maryland, New York, Virginia, and Washington.  Hana

7 Bank had customers in Korean American communities throughout the United States

8 before April of 1995.

9      Between 1996 and the present, Hana Bank has also continuously sent Hana

10 Bank newsletters to its customers in the United States.  Each of these newsletters

11 prominently displays the Hana Bank name and logo.

12      Since 2002 and through the present, Hana Bank has also operated a state-

13 licensed agency in New York City under the name HANA BANK.

14 ### B.    HANA FINANCIAL GROUP

15      HFG was incorporated on December 31, 2005 as the financial holding

16 company of Hana Bank, pursuant to the Korean Financial Holding Company Act.

17 HFG does not provide any financial services in the United States.

18 ### C.    HFI'S BUSINESS

19      HFI was established on August 15, 1994.  HFI is a privately held California

20 corporation based in Los Angeles, and provides factoring services to the Korean-

21 American business community.  HFI owns a federal trademark registration for the

22 following logo in connection with "financial services, namely factoring services,

23 asset-based lending, equipment lease financing, international trade financing, real

24 estate financing, and investment consulting services," which HFI first used in

25 commerce on **April 1, 1995**:

26

27

28

               

### D.    The History Between HFI and Hana Bank

Hana Bank's Chairman Seung-Yu Kim has had a longstanding relationship with the founders of HFI, Charles Kim and Sunnie Kim.  In the early 1990s, prior to the founding of HFI, Charles Kim and Sunnie Kim had several meetings with the Chairman concerning Hana Bank's potential investment in California Center Bank, where they were employed at the time.  As a result of those meetings, in or about 1991, California Center Bank and Hana Bank signed a memorandum of understanding concerning Hana Bank's anticipated investment in California Center Bank, and to implement a joint program to provide services to U.S. customers.  Although that investment deal was never finalized, on or about 1994, Center Bank became a correspondent bank for Hana Bank

Chairman Kim and Charles Kim frequently discussed business matters during the early 1990s, including Hana Bank's activities in the United States.  Before HFI adopted the **HANA** mark, Chairman Kim informed Charles Kim and Sunnie Kim that Hana Bank was providing services to U.S. customers through relationships such as those Hana Bank was pursuing with Center Bank.  Although Hana Bank was operating under the name Korea Investment Finance Corporation in 1990 and the first half of 1991, Charles Kim and Sunnie Kim knew that the bank was in the process of changing its name to Hana Bank.

In or about 1995, HFI's Charles Kim visited Hana Bank's Chairman Kim in Seoul, and showed him a business card containing the new HANA FINANCIAL logo.  Chairman Kim specifically asked Charles Kim why HFI was using the name "Hana" without Hana Bank's permission, and Charles Kim responded by expressing his admiration for the name and providing assurances that he would only use it in connection with factoring services so it would not create any conflict with Hana Bank's business.

HFI filed its trademark application for the "Hana" mark on August 25, 1995.  Notwithstanding his knowledge that Hana Bank had previously been doing business

-4-

in the United States using the Hana name and mark, HFI's co-founder and then-president Charles Kim signed a declaration stating under penalty of perjury that no other party had the right to use an identical or confusingly similar mark.  President Charles Kim also testified in that declaration that Hana had engaged in a host of different types of business transactions by April 1995 using the Hana mark, including the provision of factoring services, international trade financing, real estate financing and investment consulting services.  However, HFI is presently unable to offer evidence of any type of transaction using the Hana mark in April 1995 other than a single equipment leasing transaction.

## III.   HFI'S TRADEMARK INFRINGEMENT CLAIMS LACK MERIT

HFI asserts five claims against the Hana Bank and Hana Financial Group:

> Claim 1 - Trademark Infringement under 15 U.S.C. § 1114.

> Claim 2 - Trademark Infringement under 15 U.S.C. § 1125(a).

> Claim 3 - False Designation of Origin under 15 U.S.C. § 1125(a).

> Claim 4 - Trademark Infringement under Common Law.

> Claim 5 - Unfair Competition under California Business & Professions Code § 17200.

All three trademark claims have the same three elements – none of which HFI can satisfy.  And for the same reasons, HFI's remaining causes of action fail. *CreAgri, Inc. v. USANA Health Sciences, Inc.*, 474 F.3d 626, 630 n.8 (9th Cir. 2007) (holding that the success of a plaintiff's unfair competition and related claims "rises or falls with its success on its trademark infringement claims"); *Grupo Gigante S.A. de CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1100, 73 U.S.P.Q.2d 1258, 1266 (9th Cir. 2004) ("As a general matter, trademark claims under California law are 'substantially congruent' with federal claims and thus lend themselves to the same analysis."); *Brookfield Communications v. West Coast Ent.*, 174 F.3d 1036, 1046 (9th Cir. 1999) (analysis of claims based on registered and unregistered marks and federal unfair competition is the same).

W02-WEST:3AAE1\403503469.1                                          DEFENDANTS' TRIAL BRIEF

## A.    Hana Bank Has Senior Rights In The HANA Mark

"'The general rule is that '[t]he first to use a mark [in commerce] is deemed the 'senior' user' of that mark." *Brookfield Communs., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999). Hence, trademark priority derives not from any registration procedure, but from the actual commercial use of mark with respect to a class of goods or services." *CTC Int'l v. Hero Cycles Private*, 26 U.S.P.Q. 2d (BNA) 1309, 1992 WL 486354 at *4 (C.D. Cal. July 20, 1992) (*citing* 1 J. THOMAS MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION, § 16.2 (2d Ed. 1984 & Supp. Dec. 1991)); *see also Brookfield*, 174 F.3d at 1047; *Sengoku Works v. RMC Int'l*, 96 F.3d 1217, 1219 (9th Cir. 1996). In other words, the subsequent registration of a trademark does not wipe out the previously established rights of the senior user. Therefore, priority is a complete defense to a claim of trademark infringement—even where a junior user asserts a registered mark that has become incontestable. *Casual Corner Associates, Inc. v. Casual Stores of Nevada, Inc.*, 493 F.2d 709, 711-12 (9th Cir. 1974); *Watec Co. v. Liu*, 403 F.3d 645, 652 (9th Cir. 2005) ("[A] registration is not incontestable to the extent it infringes on another's valid rights in the mark acquired under state law by a use continuing from a date prior to the federal registration of the mark.").

Hana Bank possesses trademark priority in the United States because: (i) it first made services available to domestic customers at least as early as July 12, 1994; (ii) it began advertising its HANA mark in connection with financial services in the United States at least as early as July 14, 1994; (iii) it received immediate and multiple customer inquiries from the United States within days following the advertising; (iv) it obtained actual domestic customers in 1994; and (v) through the present, it has continuously obtained new customers and provided ongoing financial services to its customers in the United States. In light of the continuity of Hana Bank's advertising and other pre-sales activities, and its continued use of the HANA

mark since its first appearance in interstate commerce, Hana Bank's mark enjoys the benefit of its original priority date of July 12, 1994.

In contrast, HFI was incorporated on or about August 15, 1994, but by its own admission it did not engage in its first customer transaction until at least <u>April 1, 1995</u>.

## B.   HFI Cannot Demonstrate A Likelihood Of Confusion

To prevail at trial, not only must HFI prove that it used the HANA mark first, it must also prove a likelihood of confusion between its HANA FINANCIAL mark and the defendants' HANA BANK mark.  It cannot.

In the Ninth Circuit, the likelihood of confusion analysis considers the following factors: (1) the similarity between the parties' marks; (2) the strength of the plaintiff's mark; (3) the similarity between the parties' goods or services; (4) the similarity between the parties' marketing channels; (5) the existence of actual confusion; (6) purchaser care in selecting the parties' services; (7) the defendant's intent in selecting its mark; and (8) the likelihood that the parties will expand their services into each other's market.  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).  The majority of these factors weigh against a finding of likely confusion.

## 1.   The Similarity Of The Marks

The parties' marks must be evaluated not merely by the words they contain, but as they are encountered by consumers in the marketplace.  *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 605-06 (9th Cir. 1987).  The parties' respective brands are identified in connection with design components as follows:

            

The design component of the **HANA BANK** trademark, known as the "dancing man," has been used in U.S. commerce since 1994.  In contrast, HFI's pyramid logo

represents a moving comet, and was selected to convey the impression of "chi" or mobilized energy.  When compared, HFI's pyramid differs in appearance from the dancing man, and is intended to convey a different meaning to customers.  These highly distinct logos mitigate any similarity between the marks.  *See Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980) (confusion not likely where one party used its mark in connection with a distinctive logo);  *First Franklin Financial Corp. v. Franklin First Financial, Ltd.*, 356 F. Supp. 2d 1048, 1052-53 (N.D. Cal. 2005) (use of a "house" logo versus use of a "Benjamin Franklin" logo swayed the likelihood of confusion analysis in defendant's favor notwithstanding the near identical nature of the two word marks at issue).  Accordingly, this *Sleekcraft* factor favors Hana Bank.

### 2.      Strength Of The HANA Mark

"[A] mark which is hemmed in on all sides by similar marks on similar goods cannot be very distinctive.  It is merely one of a crowd of marks.  In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other."  *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988)

"HANA" is Korean for "ONE" or "FIRST."  Under the doctrine of foreign equivalents, the term "HANA" may be translated into its English equivalent for purposes of determining descriptiveness or likelihood of confusion.  *See, e.g.*, *In re American Safety Razor Co.*, 2 U.S.P.Q.2d 1459 (T.T.A.B. 1987).  The marketplace is crowded with financial institutions bearing names including "ONE" and "FIRST", and this weakens HFI's mark.  *First Franklin Financial*, 356 F. Supp. 2d at 1053 (acknowledging a crowded marketplace for financial services bearing marks that incorporate the term "FIRST").  A search of the United States Patent and Trademark Office reveals *one hundred sixty four (164)* active trademark registration*s* for marks incorporating either the term "ONE" or the term "FIRST" in connection with financial services.  In such a crowded marketplace, one must conclude that HFI's

1   mark is weak, and this *Sleekcraft* factor therefore favors Hana Bank.  *Glow*

2   *Industries, Inc. v. Lopez*, 252 F. Supp. 2d 962, 973, 990 (C.D. Cal. 2002) (plaintiff's

3   mark deemed weak in part due to the fact it was used in a crowded field of such

4   marks for the same types of goods; injunction denied).

### 3.   The Parties' Services Differ

6   HFI's articles of incorporation expressly excludes banking services from the

7   company's charter.  In or about 1995, HFI's former president represented to Hana

8   Bank that HFI only provided *factoring services*, and therefore there would be no

9   conflict between the parties' marks.  In contrast, Hana Bank does not provide

10   factoring services in the United States.

11   Furthermore, HFI has not proved that it used its mark in connection with

12   anything other than *equipment lease financing services* as of April 1, 1995, the

13   priority date set forth in its registration.  Certainly, the Court can equitably limit

14   HFI's enforcement efforts to those services that it was providing customers as of the

15   stated April 1, 1995, priority date, i.e., equipment lease financing.  Hana Bank does

16   not provide equipment lease financing services in the United States.

17   In practice, Hana Bank's high-income retail and investment banking services

18   are entirely distinct from HFI's mid-market factoring and equipment lease services,

19   such that both can coexist without confusion.  *Murray v. Cable Nat'l Broad. Co.*, 86

20   F.3d 858, 860 (9th Cir. 1996) (where goods or services are unrelated confusion is

21   unlikely even in the case of similar marks).

### 4.   The Parties' Marketing Channels Differ

23   Dissimilar marketing channels weighs against a finding of likely confusion.

24   *Cohn v. Petsmart, Inc.,* 281 F.3d 837, 842 (9th Cir. 2002).  Hana Bank targets high

25   net worth individuals and large corporations.  HFI, conversely, targets small to

26   medium-sized companies and loan-encumbered students.  The fact that the parties

27   market to such different audiences weighs against a finding of confusion.

### 5.   Scant Evidence Of Actual Confusion Exists

-9-

HFI's weak evidence of actual confusion consists almost exclusively of names listed by counsel in HFI's interrogatory responses. **HFI does not submit even a single declaration of a person who has been confused, nor does it explain the circumstances of any purported confusion.** Instead, it relies on the self-serving hearsay testimony of its own employees. This evidence should not be admitted, and does not support a finding of likely confusion. *See Thane Int'l, Inc. v. Trek Bicycle*, 305 F.3d 894, 902 (9th Cir. 2002) (*de minimus* evidence of actual confusion does not impact the likelihood of confusion analysis); *see also Accuride Int'l., Inc. v. Accuride Corp.*, 871 F.2d 1531, 1537 (9th Cir. 1989).

Similarly, HFI's *likelihood* of confusion survey bears no weight as evidence of *actual* confusion. HFI's surveyor has even admitted that he has no opinion on the subject of actual confusion.

### 6. Purchasers Exercise A High Degree Of Care In Using Hana Bank's High End Financial Services

Where the goods/services in question are expensive, this factor weighs against a likelihood of confusion. *First Franklin Financial*, 356 F. Supp. 2d at 1052 (buyers exercise greater care when engaging large-sum financial services, which mitigates against confusion). Confusion is less likely because consumers who exercise a high level of care when making a purchasing decision are less likely to be confused when selecting between brands. *Sleekcraft*, 599 F.2d at 353.

Courts have found that the purchase of financial services requires a higher-than-average degree of purchaser care. *See, e.g., First Franklin Financial*, 356 F. Supp. 2d at 1052; *Golden W. Fin. v. WMA Mortgage Servs.*, 2003 WL 1343019 at *5 (N.D. Cal. 2003). Because the parties' respective purchasers exercise a higher-than-average degree of care in selecting financial service, this factor weighs in favor of Hana Bank. *Sleekcraft*, 599 F.3d at 353.

### 7. Hana Bank Used Its Name In Good Faith

W02-WEST:3AAE1\403503469.1                                                          DEFENDANTS' TRIAL BRIEF

Hana Bank entered the market under its **HANA** name in 1994 for only one reason – to use *its own name* in the United States.  Defendant's expansion of a mark in which it has prior rights is evidence of good faith intent.  *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601 (9th Cir. 1987) (adopting a mark similar to one that has been used by that entity for a long period of time is an indicator of good faith).  Hana Bank's expansion into the United States represents precisely this type of natural expansion in which Hana Bank's only intent was to use its own famous brand name in connection with its banking services.  There can be little doubt about Hana Bank's good faith intent in using its own brand in the United States.  Accordingly, this *Sleekcraft* factor overwhelmingly favors Hana Bank.

### 8. Likelihood of Expansion

The fact that the parties are unlikely to enter into each other's markets mitigates against confusion.  HFI has not shown that it intends expand into general banking services, and indeed, there is some evidence indicating that it would not be permitted to do so.  Hana Bank likewise has no intent to enter the factoring market, in large part because Korean banks typically do not offer such services.  The fact that the parties are unlikely to enter each other's markets weighs against a finding of confusion.

## C. There Is No Evidence That Hana Financial Group Has Used The HANA Mark In The United States

Co-defendant Hana Financial Group ("HFG") was incorporated on December 31, 2005 as the Korean holding company of Hana Bank, pursuant to the Korean Financial Holding Company Act.  HFG does not direct the daily operations of Hana Bank or its other subsidiaries.  HFG also has not used its name HANA FINANCIAL GROUP as a trademark in U.S. commerce, and it has no plans to do so in the future.

Although HFI claims that HFG is vicariously liable for the alleged infringement by Hana Bank, there is no evidence whatsoever that HFG was involved in any of Hana Bank's U.S. activities, let alone that it directed or

1  controlled the alleged infringement.  At most, the evidence shows that: (i) HFG is

2  Hana Bank's parent; (ii) HFG and Hana Bank share some directors; (iii) HFG and

3  Hana Bank separately promote their images through a division of roles in their

4  communications team; and (iv) HFG once sponsored a single United Nations Day

5  event.

6        Without more, HFG cannot be held derivatively liable for the conduct of

7  Hana Bank simply because it is in a parent-subsidiary relationship with the bank.

8  *United States v. BestFoods*, 524 U.S. 51, 61 (1998) ("[I]t is a general principle of

9  corporate law . . . that a parent corporation . . . is not liable for the acts of its

10  subsidiaries.")

11  **IV.    DEFENDANTS' AFFIRMATIVE DEFENSES**

12       **A.    Laches**

13        The equitable defense of laches bars a trademark claim where the plaintiff has

14  unreasonably delayed in bringing suit, thereby causing prejudice to the defendant.

15  *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Assoc.*, 465 F.3d

16  1102 (9th Cir. 2006) (affirming summary judgment in favor of the defendant's laches

17  defense); *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir.

18  2002); *Transworld Airlines v. American Coupon Exchange*, 913 F.2d 676, 696 (9th

19  Cir. 1990).  "[T]he terms 'laches', 'estoppel', and 'estoppel by laches' are often used

20  interchangeably."[1]  *Grupo Gigante S.A. de C.V. v. Dallo & Co., Inc.*, 119 F. Supp.

21  2d 1083, 1104 (C.D. Cal. 2000) (vacated and remanded on other grounds at *Grupo*

22  *Gigante S.A. de C.V. v. Dallo & Co., Inc.*, 391 F.3d 1088 (9th Cir. 2004)).

23        To determine the appropriate laches period, the Court must determine when

24  the statute of limitations period expired for "the most closely analogous action under

25  state law."  *Tillamook*, 465 F.3d at 1108 (quoting *Jarrow Formulas*, 304 F.3d at

26  836).  In California, courts sometimes "borrow" a four-year period from an

27

28

---

[1]      Hana Bank has asserted estoppel as its second affirmative defense.

analogous claim for state trademark infringement, *Miller v. Glenn Miller Prods.*, 318 F. Supp. 2d 923, 942 (C.D. Cal. 2004), or a three-year period from a statutory fraud claim under Cal. Civ. Proc. Code § 338, *Karl Storz Endoscopy Am., Inc. v. Surgical Tech., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002).

The laches period begins to run from the moment the plaintiff had actual notice of the defendant's mark. *Tillamook*, 465 F.3d at 1109.  Hence, irrespective of whether this Court opts for the three or four-year statute, HFI's claims fail for unreasonable delay because, *inter alia*: (i) HFI's founders explored potential business opportunities with Hana Bank in the early 1990s; (ii) in or before 1995, Hana Bank's Chairman Kim and HFI's founder Charles Kim discussed Hana Bank's activities in the United States; (iii) before HFI was established in 1994, California Center Bank, where HFI's founders were employed, acted as a correspondent bank for Hana Bank's U.S. activities; (iv) in or about 1995, HFI's Charles Kim met with Hana Bank's Chairman Kim in Seoul, and reassured that HFI's mark would not conflict with Hana Bank's mark; and (v) the parties communicated about Hana Bank's trademark application in 2001.  These events all took place well before any applicable laches period, so HFI unreasonably delayed in filing suit. *See, e.g., Grupo Gigante,* 391 F.3d at 1101, 1105 (four year delay in asserting trademark rights after learning of infringing use constituted unreasonable delay).

HFI's substantial delay has also caused Hana Bank undue prejudice.  "[T]he prejudice that the doctrine of laches is designed to prevent occurs when a defendant, by reason of a plaintiff's delay, is or will be worse off than he would have been if the plaintiff had enforced his rights in a timely fashion." *Transworld Airlines,* 913 F.2d at 696.  Assuming, *arguendo*, that HFI had enforceable rights against Hana Bank, and assuming further that HFI had asserted those rights in 1995—rather than provide assurances that HFI would not infringe on Hana Bank's mark—it is self-evident that Hana Bank would not have spent the next twelve years expanding its own brand in the United States.  Requiring Hana Bank to now change its U.S.

identity would significantly prejudice Hana Bank as it will thwart the marketing efforts that have been expended and the goodwill that Hana Bank has established here. *See, e.g., Grupo Gigante*, 391 F.3d at 1105 (defendant made the required showing of prejudice by proving that it built a valuable business around its trademark during the four years that the plaintiff delayed the exercise of its legal rights).

### B.   Unclean Hands

The doctrine of unclean hands precludes relief to a party that has acted improperly. *Urecal Corp. v. Masters*, 413 F.Supp. 873, 875 (N.D. Ill. 1976). "It is the age-old policy of courts of equity to require that he who sues seeking equity must . . . come into court with 'clean hands' as respects that controversy." *Hall v. Wright*, 125 F.Supp. 269, 273 (S.D. Cal. 1954). To establish unclean hands, a defendant must therefore establish that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of the claims. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987).

Hana Bank's unclean hands defense has two independent bases.

*First*, in 1995, Hana Bank's Chairman Kim met with HFI's president Charles Kim (deceased) in Seoul. The two had a longstanding business relationship and frequently discussed business matters, including Hana Bank's activities in the United States. Even before HFI adopted the HANA mark, Chairman Kim told Charles Kim that Hana Bank was providing services to U.S. customers. During their meeting in 1995, Charles Kim showed Chairman Kim a business card containing the new HANA FINANCIAL logo. Chairman Kim specifically asked Charles Kim why HFI was using the name "Hana" without Hana Bank's permission, and Charles Kim responded by expressing his admiration for the name and providing assurances that he would only use it in connection with factoring services so it would not create any conflict with Hana Bank's business.

-14-

1   *Second*, Hana Bank believes that HFI purposefully designed its brand identity

2   based upon pre-existing and well-known Korean brands.  Specifically, HFI's name

3   and logo "borrowed" from the brand identities of two of the largest Korean financial

4   institutions, combining Hana Bank's name with the pyramid logo of Seoul Bank,

5   with which Hana Bank merged in 2002:

| Hana Financial Registered Mark | Seoul Bank pyramid and Hana Bank Mark |
|---|---|
|  <br> Hana Financial |  |
|  | **Hana Bank** |

12   Accordingly, because HFI has acted inequitably, it should be barred from any

13   relief in this case.

14   **V.    CONCLUSION**

15   Based on the foregoing, HFI's trademark infringement claims lack merit and

16   HFI should be denied any recovery on its causes of action.

17   Dated:  May 10, 2011

18   Respectfully submitted,
        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

19

20

21   By    */s/Carlo F. Van den Bosch*
                  CARLO F. VAN DEN BOSCH

22

23   Attorneys for Defendants
        HANA BANK and
24   HANA FINANCIAL GROUP

25

26

27

28